FILED

GEOFFREY McCABE
6104 Glen Oak
Hollywood, California 90068
Telephone: 323-464-1895; Cell: 323-819-0100
Email: merkaba22@sbcglobal.net

2009 AUG 21  PM 1:13

CLERK U.S. DISTRICT COURT
CENTRAL DIST. G. CALIF.
LOS ANGELES

BY_____

*Plaintiff and Counterdefendant in Pro Per*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

GEOFFREY MCCABE, individual
residing in California,

        Plaintiff and
        Counterdefendant, Pro se

vs.

FLOYD ROSE MARKETING INC., a
Washington corporation, HIPSHOT
PRODUCTS, INC,  a New York
corporation

        Defendant and
        Counterclaimant.

CASE NO. 09-CV-00253-RGK – (Ex)
Motion to Dismiss:
**MEMORANDUM OF POINTS AND
AUTHORITIES TO SUPPORT
COUNTERDEFENDANT'S
MOTION TO DISMISS
DEFENDANT AND
COUNTERCLAIMANT HIPSHOT
PRODUCT'S INC.'S
COUNTERCLAIMS**

**Assigned to
Hon. R Gary Klausner,
Courtroom 850
HEARING DATE; September 14, 2009
HEARING TIME;  9:00 AM
PLACE; 255 East Temple Street
Los Angeles CA 90012**

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1 | /// 

-i-

## TABLE OF CONTENTS

1. **History and Factual Information**                                         1

   A.  Technology At Issue.............................……… 3

   B.  Improvements to the Fulcrum Tremolo Pivot …………... 6

   C.  ITC Staff Ratified the Distinction of the
       Fulcrum Tremolo over Story '201 And
       Issues Statements on Validity .......................…............7

   D.  McCabe Licensing.......................................... 8

   E.  Counterclaim .............................………............. 8

   F.  Answer to Counterclaim ...................………............. 9

II.   **LEGAL STANDARD**

   A.  Sham Litigation ........................................ 10

   B.  Motion for Judgment on the Pleadings ............................. 12

   C,  Asserted Claims and 35 U.S.C. §102 ................................. 12

   D.  Asserted Claims and 35 U.S.C. §103 ................................. 13

   E.  Asserted Claims and 35 U.S.C. §112 ................................. 19

   F.  Counterclaim Paragraph 9/ Inequitable Conduct ........... 24

   G.  Objectively Reckless Conduct/Willful Infringement ........ 30

III.  **SUMMARY**                                                              38

IV.  **CONCLUSION**                                                            40

V.   **PRAYER FOR RELIEF**                                                     41

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE COURT AND ALL PARTIES AND
TO THEIR ATTORNEYS OF RECORD:**

**DECLARATION OF GEOFFREY McCABE**

I, Geoffrey McCabe, ("McCabe") declare that I am the plaintiff, PRO SE, in a complaint ("Amended Complaint") against defendant Hipshot Products, Inc. ("Hipshot") for alleged willful patent infringement of McCabe's US Patents Nos.: 6,175,066 (2001), 6,891,094 (2005) and 7,470,841 (2008) (the "'066", "'094" and "'841" patents, respectively) ("Asserted Patents"). McCabe hereby moves to dismiss Defendant And Counterclaimant Hipshot Product's Inc.'s Counterclaims ("Counterclaims") pursuant to Federal Rule Civil Procedure 12 (c).

## I. HISTORY AND FACTUAL BACKGROUND

McCabe is an individual, professional recording artist, patent owner and licensee of 6 US patents, designer of musical instrument hardware manufactured by Kahler International, Inc., Oceanside, CA, and the patentee and owner of the three patents in suit ('066, '094 and '841). The claims asserted in '066 and '094 patents involve an improved bearing arrangement that provide for adjustably mounting a fulcrum tremolo relative to the body of stringed musical instruments in general, and for electric guitars and basses in particular. The claims asserted in '841 are for a novel combination bridge-tailpiece comprising an alternate string anchoring portion.

A vibrato is a device for simultaneously varying the pitches of all the strings being played. First patented by Leo Fender, Patent No. 2,741,146 (1957) ("'146") (See Answer, Exhibit A), the "fulcrum tremolo", the most popular species of vibratos, is unique in that the entire device pivots about a common axis resulting in profound singular qualities (not found in any other species of vibratos) for which singular improvements have been patented in '066 and '094; the '146 reference

shows the Fender Stratocaster guitar to which the fulcrum tremolo is historically identified. The claims of '066 and '094 are limited to the fulcrum tremolo.

The entitling of Fender '146 as a "fulcrum tremolo" is epytomologically incorrect since (See Answer, Exhibit B, magazine article entitled "Trem Wars The Whammy Arms Race", Premier Guitar, April 2009, page 1):

> *The term tremolo is defined as a rhythmic fluctuation of volume, whereas vibrato is a fluctuation in pitch. Technically, the contraptions being discussed here achieve vibrato; but Fender, being the most influential guitar manufacturer on the planet, named their design a tremolo. From the inception of their vibrato bridge, the term tremolo is the most widely accepted name for this particular guitar part.*

McCabe contends world famous vibrato inventor, Floyd Rose, among many others, indicates in 2004, that the Fender '146 is singularly known as the "fulcrum tremolo."     (http://ronmcknight87.blogspot.com/2009_04_01_archive.html):

> *Leo Fender's development of the fulcrum tremolo for his Stratocaster line of guitars in the 1950's imparted greater tuning stability and range, but still suffered from a lack of tuning stability.*

The first two patents ('066 and '094) are related in that both are continuations of a 1993 unasserted patent 5,198,601 ("'601") based on a seminal Oct 1990 application upon which a fourth but unasserted patent 5,965,831 was issued. Upon information and belief, until the parent application for McCabe '066 and '094 was filed in Oct 1990, there were no known US patents for the novel adjustable bearing arrangement for fulcrum tremolos. The '841 patent application was submitted in 1998 and issued in December 2008.

Hipshot is a manufacturer and seller of musical instrument hardware. Hipshot states that it has been making the fulcrum tremolo products accused of infringing the '066 and '094 patents since 1998, and made cosmetic changes to the design in July 2008 from a "domed pin" design to a "conical pin". Hipshot states that it has been making the "Triple Lock Down" bridge-tailpiece products accused of infringing the '841 patent since 2004.

McCabe alleges that in phone and email discussion during 2008 Borisoff

2

1    represents that he has consulted an attorney and relates to McCabe that in view of

2    Storey US Patent No. 4,457,201 ('201) (1984) for a "Combined Bridge And

3    Tailpiece Assembly For A Stringed Musical Instrument" which discloses a

4    stationary bridge-tailpiece assembly where only the tailpiece portion is rotatably

5    supported by a ring-style ball bearings:

6        *My patent attorney does not think that my patent infringes upon yours. In view*
7        *of Saijo (4,932,302)., he does not think that your patent can be interpreted so*
       *broadly as to include my construction. If my construction infringes upon your*
8        *patent then Saijo also would and Saijo predates your patent.*

9    And Saijo 4,932,302 ('302) (1990) which provides improved pivots that mate

10    to receptacles on the fulcrum tremolo base plate, the McCabe patents are invalid and

11    or there is no infringement; in an email from Borisoff on March 17, 2008:

12        *You may be interested in an older patent that discloses a tremolo that is both*
13        *adjustable and uses ball bearings. It is US Patent No. 4,457,201 (Storey).*

14    McCabe alleges that Storey '201 does not disclose a fulcrum tremolo as

15    commonly understood or as defined in specification of not only '066 and '094 but

16    '841 as well and, therefore, is not material and that 'Saijo '302 as with other cited

17    prior art below teaches away from '066 and '094 bearings/riser post improvements.

18    Borisoff denies infringement.

19                 **A.      Technology at Issue**

20
21     '094 and '066, Background of the Invention, paragraph 3:

22        *In a stringed musical instrument, such as a guitar, the strings extend*
       *unsupported between a first critical point on a neck of the guitar and a*
23        *second critical point on the guitar body. The first critical point is usually*
       *formed by a nut supported in the neck. Generally, the second critical point is*
24        *formed by a bridge element constituting part of a bridge or a combined*
       *bridge and tailpiece assembly.*

25    McCabe asserts that is common understanding among players and

26    manufacturers that in acoustic and electric guitars the height of the strings relative to

27    the fingerboard is key to accurate pitch intonation as well as playability. If the

28

strings are too high, for example, the required force of the fingers to press the string against the fingerboard is greatly increased which thereby increases the tension of the string causing the intonation to go sharp and considered a disadvantage. In general, players require a "low action" to maintain accuracy of the chosen pitches and provide lowered resistance for the fingers and hands in the effort to achieve the best expression of any musical figure. Features providing adjustable positioning of the vibrato on the instrument is further necessary for the commercial success since any device will be required to fit on many differing guitar and bass designs with their own particular requirements.

McCabe asserts that in Fender '146, since the pivot is in a fixed position to the body of the instrument, the adjustment of the relative height of each of the bridge elements and, therefore, the strings upon which they individually rest, positioned on the base plate is achieved by set screws adjustably positioned within the bridge element which bearing contact with the base plate. Threading the set screws raise or lower the strings relative to the instrument body and, the fingerboard.

The fulcrum tremolo design is unique in comparison to other vibratos in that it combines the "tailpiece", the portion that secures the string to the instrument body, and the "bridge", the portion that supports the strings over the body, such that the entire device pivots around an axis to create the desired vibrato effect. The preferred position of the fulcrum tremolo relative to the stringed musical instrument, "initial position", is a delicate balance between the tension of the strings on one hand and the tension of "biasing" springs on the other; any changes to the tension of either component will alter the "initial position" of the entire vibrato including, notably, the critical position of "bridge" element to the "nut" (for supporting the strings where the "neck" meets the "head" of the instrument) which establishes the scale or harmonic length of the instrument. The Fender '146 requires six wood

4

1    screws in a single row along the knife-edge "front" or leading edge of the base plate

2    portion which pivotally secures the vibrato to the instrument on a single axis.

3        Accordingly, when the fulcrum tremolo is pivoted for creating the "vibrato"

4    effect, several mechanical or physical characteristics singularly distinguish the

5    fulcrum tremolo from other species '094 and '066, Background of the Invention:

6
7        1)    *When a fulcrum tremolo is used, there is the tendency when increasing
        string tension and raising of pitch, also to increase the length of the string,
        and, conversely, when decreasing string tension and lowering pitch, also to
8        decrease the string length.  Col. 1, line 66 – col. 2, line 3.*

9        2)    *With the development of the fulcrum tremolo, that is, where the bridge
10        plate is pivoted to provide a tremolo or vibrato effect, ...there is a tendency to
        upset the harmonic tuning of the strings. Col. 2, lines 6 – 14.*
11    And

12        3)    *Since the second critical point is offset from the pivot axis, initially
13        there is a tendency for the string height at the bridge to decrease when the
        base plate is pivoted toward the body with the strings contacting the
14        fingerboard and causing an undesirable buzzing noise and/or deadening the
15        sound of the strings. This phenomenon limits upward pitch change. Col. 3,
        lines 11 – 17.*
16

17        '201 discloses a stationary bridge-tailpiece assembly where only the tailpiece

18    portion is rotatably supported by a ball bearings which, being in a fixed positioned,

19    one on each side of the rotatable member, forming a singular axis for creating the

20    desired effect. Further, the whole device is adjustably secured by two pairs of

21    threaded posts that prevent the assembly from pivoting relative to the instrument

22    body for creating the vibrato effect.  '201 has been manufactured by unnamed co-

23    inventor of '201, Gary Kahler, CEO Kahler International, for over 25 years. Better

24    known as the Kahler Tremolo System, '201, is an "electric guitar bridge with a cam

25    operated vibrato arm system…. Kahler also produces one of the only bass tremolo

26    systems currently available (Hipshot produces a fulcrum-based unit not unlike the

27    two-point system used on Fender Stratocasters currently built in the United States)."

28    (http://en.wikipedia.org/wiki/Electric_guitar). (See Answer, Exhibit B, pages 6-8).

1    Kahler served as an Expert Witness in a patent infringement Complaint filed
2  by McCabe Pro Se in 2006 with the US International Trade Commission, TA-586,
3  for imported "fulcrum tremolo" products.  In the 2007 "Report of Mr. Gary Kahler,
4  Expert Witness for Complainant", (See Answer, Exhibit C, pages 4-5), Kahler
5  clearly states that '201 does not meet the several requirements that clearly
6  distinguish a "fulcrum tremolo".

7           **B.    Improvements to the Fulcrum Tremolo Pivot**
8    Various improvements have been created for the pivot of a fulcrum tremolo.
9  Rose 1979 US Patent No. 4,171,661 ("'661") provide two "riser posts", one on each
10  side of the tremolo, with a circular groove each mated to a semi-circular "knife-
11  edge" shape that allows for adjustably supporting the device relative to the
12  instrument body and a greater field of rotation and is known as a "floating" tremolo.
13  In '661 the bridge elements in sharp contrast to '146 are fixedly secured to the base
14  plate. String height adjustment relative to the instrument body and fingerboard, is
15  carried out solely by the positioning of the fulcrum tremolo relative the instrument
16  body by the riser-posts.

17    McCabe contends all known cited prior art recitations with the pivot fixedly
18  secured to the instrument body, regardless of type, teach string height adjustability,
19  if at all, in exactly the manner of '146 and away from '661 as well as '066 and '094.

20    McCabe contends that the improvement of '066 and '094 concern a bearing
21  arrangement that improves both the accuracy and durability while expanding the
22  "adjustability" features over the knife-edge/riser post combination. McCabe
23  contends that the improvement can further comprise riser posts, cutouts in the base
24  plate that can function as bearing housings, transverse shafts and/or separate bearing
25  housings.
26
27
28

**C.    ITC Staff Ratifies the Distinction of the
Fulcrum Tremolo over Story '201
And
Issues Statements on Validity**

McCabe contends that the above referenced Expert Witness report by Gary Kahler in ITC TA-586 supports McCabe's patents and the wide spread understanding of uniqueness of the fulcrum tremolo over Storey '201, both species of which Kahler has manufactured.

Floyd Rose Speedloader fulcrum tremolos were named as infringing claims 9-11 of '066 and certain claims of '094. McCabe's ITC representing attorney, Reza Ghaforian (The Marbury Law Group, PLLC – formerly Hansen Huang Technology Law Group, LLP), report that the ITC Staff Post-Hearing Brief and Findings of Facts Document from September 2007 found:

> *Validity of the '066 patent was favorably discussed.... Validity of the '094 patent was favorably discussed.... Written description, indefiniteness and enablement issues were also favorably discussed. Validity of the '191 patent was favorably discussed ... and McCabe's '601. Indefiniteness was also favorably discussed.*

And further:

> *We are pleased to report that the Staff's position as to the '094 and '066 patents is in our favor. They have concluded that Rose has infringed all the asserted claims of the '066 patent and claims 1 and 14-18 and 20-22 of the '094 patent.*

McCabe contends that the above discussed unique qualities of the fulcrum tremolo that distinguish it from all other species of tremolos or vibratos including Story '201 has been further shown in the successful testing of the validity of the Asserted Patents and findings of infringement in TA-586 for improvements such as "enlarged bridge elements" by the ITC. Accordingly, McCabe contends that it is clear that at least three of such patents, '066, '094 and unasserted '191, have been successfully tested during litigation.

### D. McCabe Licensing

In 2007, after filing ITC Complaint TA-586, two accused infringers of McCabe bearing arrangements patents agree to license. McCabe contends that the ITC OUII Staff, representing the People of the United States, issued favorable statements in their pre- and post-hearing briefs on the validity of the Asserted Patents in this present controversy as well as infringement findings regarding other accused products later that year and despite controversial interpretations of the "Domestic Industry" requirement, the Judge does not issue import sanctions against respondent, Floyd Rose Marketing, Inc. ("Rose").

Claims of '094, '066 and '841 as well as unasserted '191 for the bearing arrangement improvements are licensed to French musical instrument manufacturer, Vigier, as well as to Japan's Ibanez (Hoshino Gakki Co., LTD), ("Hoshino"), the third largest guitar manufacturer in the world back through its introduction in 2003.

### E.    Counterclaim

Hipshot agrees in the Counterclaim that Paragraphs 9, 15, 23 and 31 of the Answer state correctly that the subject of Asserted Patents "in general, relates to a fulcrum tremolo for a stringed instrument".

In answer Hipshot contends in paragraphs 5 – 8 that the claims of '066 and '094 sued upon are invalid under 35 USC §102, §103, §112, or if not invalid, then they are not infringed. And further, in paragraph 9:

> *Hipshot contends that the '094 patent is unenforceable in whole or in part on account of the failure by Plaintiff to comply with his duty of candor before the USPTO by 37 C.F.R. §1.56. While the '094 patent was pending, Plaintiff was aware of a patent issued to Storey in 1984, US Patent No., 4,457,201. (the '201 patent), the Storey patent having been cited by the Examiner during prosecution of the '066 patent. Plaintiff did not disclose the existence of the '201 patent in the course of prosecution of the '094 patent, as required by 37 C.F.R. §1.56. The Storey '201 patent, while for a slightly different species of tremolo than the '094 patent, discloses each and every element recited in claims 24 and*

*25 of the '094 patent, and therefore was material to the patentability o f the '094 patent.*

Claims of the '066 patent rejected in view of the '201 patent were of substantially the same scope as claims that were being sought by Plaintiff in the ' 094 application, and therefore Plaintiff was on notice that the '201 patent was material to consideration of the '094 patent claims. Plaintiff s failure to disclose the '201 patent was for the purpose of deceiving the examiner as to the state of the art, and hiding art from the examiner that discloses every element of claims 24 and 25 o f the '094 patent.

### F.    Answer to Counterclaim

Under Civil Rule (CR) 8, McCabe had denied each and every allegation of the Counterclaims not expressly admitted in Answer.  McCabe also expressly denied some allegations without affecting its general denial of other allegations. If an answer to any such allegation had been required, McCabe denied each such allegation that was not expressly admitted.

Paragraphs 1 – 4 concerning the parties and the venue are admitted.

In the Answer McCabe denied paragraphs 5 – 8 and stated that the '066, '094 and '841 are valid. Paragraph 10 is inherently admitted by the instant motion to dismiss the Counterclaims.  The issues regarding paragraph 9 were expounded upon. McCabe agrees that Hipshot seeks a "judicial determination" in paragraph 11.

McCabe contends that while the claims for bearing arrangements of Hipshot's Borisoff 6,015,945 ("'945") (2000) are not the subject of the suit per se despite the clear priority of '066 and '094 over '945, the prosecution and cited references relative to '945 are material to establishing a continuity of USPTO positions on the claims and the references, the merits of the Counterclaim and/or other Hipshot actions as well as material to the production of additional evidence in regards to McCabe's contention of "objectively reckless conduct" conduct in patent rights of Hipshot in general and toward McCabe's patents in particular; ie., whether Hipshot meets the *"standards of behavior by which a possible infringer evaluates adverse patents"* and meets *"the standards of fair commerce"; In re Seagate Tech, LLC.*

9

## II.    LEGAL STANDARD

### A.    Sham Litigation

*[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps. They get anywhere with the accusation in but a small percentage of the cases, but such charges are not inconsequential on that account. They destroy the respect for one another's integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the courts in making a sound disposition of their cases, and to sustain the good name of the bar itself. A patent litigant should be made to feel, therefore, that an unsupported charge of "inequitable conduct in the Patent Office" is a negative contribution to the rightful administration of justice.*

*Burlington Industries, 849 F.2d at 1422.*

McCabe in his July 2009 Answer essentially contends the Counterclaim, paragraphs 5 – 9, are predicated on "sham" litigation since at least Borisoff and/or Hipshot attorneys knew, know or should have known that:

- There are no known US Patents for an improved bearing arrangement that provide for adjustably mounting a fulcrum tremolo relative to the instrument body prior to McCabe's 1990 application.

The assertion of the '201 as material prior art to '066 or '094 claims is not survivable since:

- As above, the professional music world knows and accepts and, as clearly defined in specification of the all of the Asserted Patents, '201 is not a "fulcrum tremolo";

- Since the bridge elements of a fulcrum tremolo pivot with the tailpiece, claims 9 –12 of '066 as well as claim 16, for example, of '094 provide unique improvements that would not work with other species of vibratos in general and in particular '201;

- The appearance of the '201 reference in the prosecution history of '066 is

10

1    based on an epystomological confusion by a second examiner after the

2    claims had been allowed by a first examiner;

3    • The USPTO, other than in '066, spanning nearly two decades, four

4    Examiners and at least one Supervisor, all in the same "Art Unit" at the

5    USPTO, as well as the McCabe patent attorneys, '201 was never

6    considered to be or cited as material prior art reference as shown in part:

7        a) '945 for bearing arrangements on a fulcrum tremolo, and;

8        b) McCabe patents for bearing arrangements on the fulcrum tremolo:

9        6,563,034 ("'034") and 5,986,191 ("'191") (Answer page 11);

10

11    And, further, McCabe contends that the Hipshot assertion of the Saijo '302 in

12  view of Rose '661 as material prior art to '066 and/or '094 claims is not survivable

13  since:

14    • '302 teaches away from the McCabe improvement; (Answer page 18) and;

15    • Saijo 5,088,374 ("'374") (1992) for a similar double pivot arrangement to

16    '302 was one of several "References Cited" in '066 and also teaches away

17    from the McCabe improvement.

18    • Hipshot knew or should have known that Hipshot's own '945 claim 1:

19        *A bearing system for a tremolo bridge of a guitar, comprising:*
20        *a bearing surface mountable on a body of a guitar; a rocker mountable*
        *on the tremolo bridge, said rocker defining a rocker surface*
21        *contactable to and cooperating with said bearing surface to provide*
        *smooth movement of the tremolo ... whereby a smooth rocking action*
22        *with minimal resistance is facilitated.*

23    Is a broader independent claim for a bearing arrangement on a fulcrum

24    tremolo than either base claim for bearing arrangements of the Asserted

25    Patents and yet issued in view of the '661 and '302 references.

26    Accordingly, McCabe contends that no true controversy exists and moves that

27  the claim of paragraph 5 as well as claims 6 – 9 be dismissed.

28

## B.    Motion for Judgment on the Pleadings

Further, McCabe asserts that Counterclaims paragraphs 6 – 8:

> **6**. *Hipshot contends that claims 1, 2 and 4 of the ' 066 patent are invalid as failing to meet one or more of the conditions for patentability as set out in 35 U.S.C. §102, §103, and/or §112.*
> **7**. *Hipshot contends that claims 24 and 25 of the ' 094 patent are invalid as failing to meet one or more of the conditions for patentability as set out in 35 U.S.C. §102, §103, and/or §112.*
> **8**. *Hipshot contends that claims 1 and 5 of the '841 patent are invalid as failing to meet one or more o f the conditions for patentability as set out in 35 U.S.C. §102, §103, and/or §112.*

Simply provide no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" and that the factual allegations within the claim do not raise the right to relief above the speculative level. A Motion for Judgment on the Pleadings is requested to dismiss the counterclaim.

## C.    Asserted Claims and 35 U.S.C. §102

A claim is anticipated and therefore invalid when "the four corners of a single, prior *art* document describe[s] every element of the claimed invention. either expressly or inherently, such that a person of ordinary skill in the *art* could practice the invention without undue experimentation." *Advanced Display Systems, Inc. v. Kent Sate University, 21 2* F.3d 1272, 1282 (Fed. Cir. 2000); *See also, Glaxo, Inc. v. Novopharm Lrd.. 52* F.3d 1043. 1047 (Fed. Cir. 1995). As with all assertions of patent invalidity, anticipation must be established by clear and convincing evidence.

What McCabe asserts that in addition to affirming that the USPTO acted correctly in issuing the Asserted Patents, is that there are no known prior art references for an improved bearing arrangement that provide for adjustably mounting a fulcrum tremolo relative to the body of stringed musical instruments in general, and for electric guitars and basses in particular, since Storey '201 is not for a fulcrum tremolo and Saijo '302 teaches away from the invention of the Asserted Claims of '066 and '094. And similarly, McCabe asserts, that for a combination bridge-tailpiece providing alternate anchoring of '841, the only known Hipshot

1  reference is depicted as a tailpiece device only and not for a bridge-tailpiece device
2  with specific limitations that would be material to '841 and the meeting of the
3  general requirements of §102.

### D.     Asserted Claims and 35 U.S.C. §103

5      Obviousness is a question of law based on the four factual determinations set
6  forth in *Graham* v. *John Desre Co., 383* US. 1, 17 (1 966): (1) the scope and content
7  of the prior art; (2) the differences between the prior art and the claims at issue; (3)
8  the level of ordinary skill in the art; and (4) objective evidence of nonobviousness,
9  *i.e..* long felt need, unexpected results, and commercial success. *See Fromson* v.
10 *Anitec Printing Plates. Inc.. 132* F.3d 1437, 1446 (Fed. Cir. 1998); *Hybritech Inc.* v.
11 *Monoclonal Antibodies Inc.. 802* F.2d 1367, 1382-1 384 (Fed. Cir. 1986).

12     Obviousness under section 103 is determined by the response to the question
13 whether the claimed invention would have been obvious to one of ordinary skill in
14 the appropriate *art* at the time the invention was made. In *re Rouflet et al.,* 149 F.3d
15 1350, 1357 (Fed. Cir. 1998); *Fromson,* 132 F.3d at 1446. The issue of obviousness
16 is not resolved by reference to the actual inventor's knowledge and skill, but rather
17 by reference to the hypothetical person of ordinary skill in the art with access to all
18 prior *art* references in the field of the invention. *In re Rouffet* et al., 149 F.3d at
19 1357.

20     In determining whether the differences between the claims of the patent at
21 issue and the prior art are sufficiently obvious, it must be determined whether one
22 skilled in the art would have been motivated to select and combine features from
23 each cited reference in order to make the  claimed invention at the time it was made.
24 *Richardson-Vicks, Inc.* v. The *Upjohn* Co., 122 F.3d 1476, 1480 (Fed. Cir. 1997);
25 *Continental Can* Co. *v. Monsanto Co.,* 948 F.2d 1264, 1271 (Fed.Cir. 1991).
26 Obviousness cannot be established by combining the teachings of the prior art to
27 produce the claimed invention, absent some teaching or suggestion supporting the
28 combination.  Fromson, 132 F.3d at 1447; In re *Fritch,* 972 F.2d 1260, 1266 (Fed.

1  Cir. 1992). The Federal Circuit has identified the following as factors that may

2  motivate one to combine references: the nature of the problem to be solved, the

3  teachings of the prior art and the knowledge of persons of ordinary skill in the art. *In*

4  re *Rouffet et al.,* 149 F.3d at 1355-56. Further, besides affirming that the USPTO

5  acted correctly in issuing the Asserted Patents, McCabe asserts that the Asserted

6  Claims are not obvious:

7      **i.**    Non-obvious arguments are supported by the above licensing which

8  specifically addresses long term wear and accuracy issues in the "knife-edge/riser

9  post" arrangement and related installation issues arising from deviations from the

10  standards of riser post placement dimensions from various manufacturers. '066, Col

11  7, lines 49-53.   A long-felt need, failure of others to solve the problem, and

12  critically, the commercial success of the invention are indicia of non-obviousness.

13  *Minnesota Mining & Manufacturing Co. v. Johnson & Johnson Orthopaedics, Inc.*

14  *976 F.2d 1559, 1573, 24 U.S.P.Q.2d 1321, 1333 (Fed. Cir. 1992).*

15       Licensing to the Hoshino began in 2007 for one series of guitar lines called

16  the ZR Tremolo have been expanded to yet another series from this international

17  manufacturer since 2008.  Vigier continues to manufacture under license to McCabe

18  ball bearing arrangements and Kahler International, Inc., as a consequence of the

19  legal opinions by the ITC OUII Staff, has agreed to manufacture at least McCabe's

20  ball bearing fulcrum tremolos.

21       **ii.**    Further, consideration of the bar of creating "unexpected results" in

22  determining non-obviousness is alternately appropriate. The bearing arrangement of

23  the Asserted Claims comprises bearings and riser posts threadably secured to the

24  instrument for adjustably positioning the device; by replacing the knife edges with

25  bearings the unexpected occurs: the quality of the device is greatly improved since

26  bearings do not wear out as quickly as the knife-edge arrangements and thereby

27  maintain long term accuracy over knife edges and, separately, eliminates the

1  requirement of the vibrato base plate to be parallel to the instrument body. Also,
2  depending on the bearing arrangement design, the field of rotation of the fulcrum
3  tremolo can be increased. In adapting a shaft, transverse the strings, directly to the
4  base plate to create a pivot axis, the unexpected occurs: the riser posts can be
5  variably placed relative to one another since the riser posts can support the device at
6  a number of points along the length of the transverse shaft.

7      The McCabe bearing improvement also comprises cutouts in the base plate
8  which can be housings. (http://www.merriam-webster.com/dictionary/housing[1]):

9
10      *2 a: a niche for a sculpture b: the space taken out of a structural member (as
       a timber) to admit the insertion of part of another*
11      *3: something that covers or protects: as a: a case or enclosure (as for a
       mechanical part or an instrument) b: a casing (as an enclosed bearing) in
12      which a shaft revolves c: a support (as a frame) for mechanical parts.*

13      The oval opening 30a, in the instance of the preferred embodiment using
14  multi-ball race bearings, found in housings 30, each formed to receive their
15  respective riser post 52, the unexpected occurs further yet: the oval opening takes
16  advantage of the breadth of transverse shaft 60 for accepting riser posts variably
17  distanced to themselves and provide an adjustability for the fulcrum tremolo's
18  distance relative to the body as well as provide 1) an adjustability for mounting one
19  side of the fulcrum tremolo higher than the other as well as 2) for lateral
20  adjustability for better matching of the position of the bridge elements of the vibrato
21  relative to the fingerboard and nut. (See Exhibit A, Figs 3, 4A and Exhibit B, 4B of
22  '066 and '094).

23      Again, upon information and belief, there are no known instances of US
24  Patents that show bearings on fulcrum tremolos with the above adjustability feature
25  prior to the application date of Oct. 1990 in general and, in particular, no known
26  prior art that shows fulcrum tremolos with bearings in conjunction with any
27  combination of the following:
28

15

- Riser posts for adjustably positioning the device relative to the instrument body on the one hand and, on the other, riser posts that can be variably positioned relative to one another;

- A shaft or pin, transverse the direction of the strings, attached to the fulcrum tremolo connected to riser posts forming a pivot axis that provides a variable positioning relative to at least one of the riser posts;

- Cut-outs in the fulcrum tremolo base plate forming a housing for receiving a such a shaft or other bearing arrangements connected to the riser posts.

**iii.** In '066 and '094, as well as two other unasserted McCabe patents sharing a similar disclosure, the USPTO concluded that Shiboya 4,383,466 ("'466") and/or '374 in view of '661 was not obvious.

'201 shows the relative position of the bearings to each other and to the entire assembly is fixed.

Rose '661 shows adjustable riser posts positioned 2.95" apart.  Later iterations of '146 from Fender with knife-edge pivots show the riser posts positioned 2.22" apart. (See Exhibit C).  McCabe contends that positioning the riser posts outside of the design specification defeats the critical bearing contact between the knife-edge and the riser posts and inhibits the vibrato's return to initial position if not outright damage to the knife-edge.

Prior art Saijo '302 provides improved pivots in a fixed distance to one another that mate to receptacles on the base plate prevent the device from being adjustably mounted relative to the instrument body.  Prior art reference Saijo '374 for a double pivot arrangement, one of several "References Cited" in '066 and similar to '302, all of which are referenced in Hipshot's '945 patent, argues distinction away from riser post arrangements by providing portion 13 with preset recesses ('302, Col. 1, lines 42 - 65) and fully relies on string height adjustability in the manner of '146.

Similar prior art Shiboya '466 fully relies on string height adjustability in the manner of '146 and in the Background Of The Invention, Paragraph 12:

16

1
2
3

*In the Shiboya U.S. Pat. No. 4,383,466, a pin was located in a hinge pivot to improve the return to the initial tuned position. This arrangement did not offer lateral height adjustment of the base plate and the field of rotation was not as great as in the Rose improvement.*

Further, McCabe asserts that the Hipshot reference, Petrillo 4,643,070 ("'070") (1987) is cumulative to '466 since the entire vibrato rotates around a shaft, "co-linear" axel 48, supported by "bearing 52" fixedly secured to instrument body 14 via device's "frame-shaped member 24".

McCabe contends that it is significant that '070 does not disclose any manner for achieving the requisite string height adjustment in the text portion of the disclosure or by careful analysis of the apparent design shown in the Figures 1-4, and, therefore, does not teach string height adjustability at all, and, further, like the Saijo and Shiboya references, teaches away from riser posts that provide for adjustably mounting the fulcrum tremolo relative to the instrument body.

The Supreme Court, in the KSR decision, *KSR International Co. v. Teleflex Inc.,* indicates the Federal Circuit's Teaching, Suggestion, or Motivation (TSM) test. Given that there is no evidence of any "motivation or suggestion to combine the prior art teachings" that can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art and in view of the evidence of commercial success, long-felt but unsolved needs, failure of others, and unexpected results, McCabe assert both '066 and '094 are unobvious.

Further, McCabe asserts that the Asserted Claims of '841 are not obvious:

**iv.** The asserted claims of '841 are for a novel combination bridge-tailpiece having an alternate string anchoring provision. McCabe alleges that Borisoff claimed for years prior to '841 issuing in December 2008 that Hipshot was aware of invalidating prior art concerning the improvement. Despite requests to view the claimed reference, Hipshot only first produced the asserted reference in early 2009. What is depicted comprises a sole tailpiece having an alternate string

17

1    anchoring provision. (See Exhibit D). McCabe asserts that while the tailpiece shows
2    an alternate string anchoring provision:

3    • Hipshot has not provided data that tailpiece was manufactured prior to the
4    '841 priority date of 1998; and, more importantly,

5    • The shown tailpiece does not anticipate because it neither shows a
6    combination bridge-tailpiece nor any of the particular limitations in claims
7    1 and 5.

8
9    In the Hipshot prior art reference there is no bridge element connected to a
10   base or "a first portion connected to the base and located in the rearward end
     forming an alternate string anchoring point closer to the lower portion than the
11   second critical point" specified by claim 1, for example.
12   The Hipshot prior art reference in Exhibit D does not disclose as specified by
13   claim 5 (See Fig. 11 – Exhibit E):

14   *[a] first portion having a rearward surface having a string anchoring point
     comprising a recess formed to receive a string anchor therein and a second
15   portion that is transverse to the first portion comprising: a first end that
     connects the second portion to the first portion; a second end, the second end
16   having an alternate string anchoring point comprising a recess formed to
17   receive a string anchor and an elongated passageway that extends through
     the second portion from the first end to the second end, along a longitudinal
18   axis of the second portion, forming at least one opening on each end.*
19

20   Accordingly, McCabe asserts that since Hipshot knew that there was no prior
21   art basis for the claim of paragraph 8 of the Counterclaim that could survive, "sham"
22   litigation is further exemplified.
23   Finally, McCabe asserts that since there is no other known prior art that in
24   part or in whole anticipates a combination bridge-tailpiece providing the claimed
25   subject matter, McCabe respectfully asserts that the Asserted Claims are not obvious
26   and the relevant counterclaims of 5– 9 in this aspect should be dismissed as well.

27
28

### E.    Asserted Claims and 35 U.S.C. §112

Both the patent applicant and the attorney prosecuting the application have a duty of candor to the Patent and Trademark Office that requires them to disclose all relevant facts. 37 C.F.R. § 1.56 (a). Violation of this duty of candor during the prosecution of a patent application constitutes inequitable conduct that can render the claims of the patent unenforceable. *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories*, Inc., 984 F.2d 1 182, 1 189 (Fed. Cir. 1993). A patent is held unenforceable based on inequitable conduct when an applicant breaches this duty by (1) withholding from or misrepresenting material information to the patent examiner (2) with an intent to deceive or mislead, both of which must be proven by clear and convincing evidence. *Baxter International, Inc. v. McGaw*, Inc., 149 F.3d 1321 (Fed. Cir. 1998) ("Baxter"); *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867,872 (Fed. Cir. 1988). cert. denied, 490 U.S. 1067 (1 989). The Federal Circuit has described inequitable conduct as including "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material coupled with an intent to deceive." Baxter at 1327. In determining whether a patent should be held unenforceable for inequitable conduct. a court conducts a two step analysis. First, the court must determine whether the withheld reference meets a threshold level of materiality. The second step is for the court to determine whether the evidence shows a threshold level of intent to mislead the examiner. The court then weighs the materiality of the reference with the evidence of the applicant's intent. The more material the reference, the less evidence of intent will be required in order to find that inequitable conduct has occurred. *Id.*

What McCabe expects to argue and the evidence will show is that there is no evidence that the patents at issue are unenforceable for inequitable conduct and/or that McCabe knew of and withheld or misrepresented material facts regarding the patentability of the McCabe '066, '094 and '841 inventions and/or that McCabe acted with an intent to deceive any examiner ever.

1    As set forth in 35 U.S.C. section 112, paragraph 1, a patent's specification
2    must contain "a written description of the invention, and of the manner and process
3    of making and using it, in such full, clear, concise, and exact terms as to enable any
4    person skilled in the art to which it pertains, or with which it is most nearly
5    connected, to make and use the same." The Court of Appeals for the Federal Circuit
6    has explained that the enablement requirement is met "when one skilled in the art,
7    after reading the specification, could practice the claimed invention without undue
8    experimentation."

9    The Federal Circuit's decision in *Sitrick v. Dreamworks*, LLC, 516 F.3d. 993
10   (Feb. 1, 2008) further defines the bar for enablement. The court explained that in
11   order to satisfy the enablement requirement, "the full scope of the claimed invention
12   must be enabled." *Sitrick, supra, at 999.* The court explained its rationale:
13   "Enabling the full scope of each claim is 'part of the quid pro quo of the patent
14   bargain.'" *AK Steel, supra, 344 F.3d. at 1244.* A patentee who chooses broad claim
15   language must make sure the broad claims are fully enabled. "The scope of the
16   claims must be less than or equal to the scope of the enablement" to "ensure that the
17   public knowledge is enriched by the specification to a degree at least commensurate
18   with the scope of the claims."

19   Besides affirming that the USPTO acted correctly in issuing the Asserted
20   Patents, McCabe contents the term "ball bearing member" in the phrase "wherein
21   said bearing means comprises at least one ball bearing member" and "a portion of a
22   ball bearing surface" describing in part the bearing arrangement as found in claims
23   1, 2 and 4 of '066 and claim 24 of '094, respectively, are fully enabled and found in
24   the specification. Summary of the Invention, Col 7, line 38:

25       *... the base plate is pivotally supported in a bearing assembly ...*
26       *adjustably mounted so that the plate can be variably spaced from the*
         *surface of the body.*
27
28

1  Summary of the Invention, Col 7, lines 45 - 48:

2  *Also by using self-aligning bearings or a bearing affording a universal*
   *joint type movement, it is possible effectively to pivotally support the*
3  *base plate, when its axis is not parallel with the surface of the body.*

   And in the Detailed Description of the Drawings, Col. 15, lines 22 -30:
4  *While a quad-stack bearing assembly 56 is shown for pivotally*
   *supporting the bridge-tailpiece assembly 16, a variety of pivot bearings*
5  *could be employed. A significant feature is that the bearing assembly*
6  *permits the displacement of the bridge-tailpiece assembly with the pivot*
   *axes of the pins 60 not parallel to the surface of the body 3. This*
7  *feature is important when the bearing housings 30 on the opposite*
8  *sides of the bridge-tailpiece assembly each have a different height*
   *above the body surface of the guitar.*
9

10 In the Detailed Description of the Drawings, Col 14, line 67 - Col. 15, line 3:

11 *Adjustment of the post 52 is effected through an oval opening 30a in*
   *the top of the housing 30. The oval shape permits relative movement*
   *between the post 52 and the housing 30.*
12
   Its is commonly known to those who use and manufacture the fulcrum
13
   tremolo that the field of rotation for creating the "tremolo" or vibrato effect is slight,
14
   often less than 11-12 degrees of rotation in general use. It is inherently true that the
15
   proportion of the available surface area of any ball structure required for the
16
   function of the bearing to be successful is minimal since there is no requirement that
17
   the bearing portion spin.
18
   The '066 and '094 specification and common definitions provide that a "ball
19
20 bearing member" does not necessarily equate to the term "ball bearing" in the

21 narrowest sense. An example of the above cited *"variety of pivot bearings"* or *"self*

22 *aligning"* bearings includes the "rod bearing" and/or "spherical" bearings where a

23 single ball exists solely in a ring arrangement like the more familiar "multi-ball

24 bearing races" that otherwise comprise more than one ball bearing.

25    These bearings comprise a single "ball bearing member" that can receive a

26 transverse support shaft through an opening in the ball and, therefore, has a reduced

27 surface area that is approximately less than 50% of the surface of an otherwise pure

28 geometric shape of a "ball" or "sphere". This bearing design is successful in

21

applications where a portion of a ball surface is sufficient to meet required function for a flexibility of installation and minimal field of rotation. (See Answer, Exhibit H). Additionally, McCabe asserts that Examiner Lockett, in telephonic conversation during the early stages of the '094 prosecution conferred with McCabe and agreed; and, therefore, claim 24 of '094 provides for a bearing arrangement comprising only the "portion of the surface" of a "ball bearing member" since, the plain physical facts of the requirement mean that the reduced surface area is sufficient for a successful pivot.

As provided in the above "Asserted Claims and 35 U.S.C. §103" section, the McCabe bearing improvement also comprises cutouts in the base plate which can be housings. As described in the specification of '066 and '094 the oval opening in the instance of the preferred embodiment using multi-ball race bearings, found in housings, each formed to receive their respective riser post. The oval opening takes advantage of the breadth of transverse shaft for accepting riser posts variably distanced to themselves and provide an adjustability for the fulcrum tremolo's distance relative to the body as well as provide 1) an adjustability for mounting one side of the fulcrum tremolo higher than the other as well as 2) for lateral adjustability for better matching of the position of the bridge elements of the vibrato relative to the fingerboard and nut. (See Exhibit I, Figs 3, 4A and 4B of '066 and'094).

Accordingly, McCabe asserts that the claim terms for "ball bearing member", a "portion of a ball bearing surface", "housings", "shaft" and "a post threadedly connected to said body … for adjusting the position of said bearing housing relative to said body" are fully supported, enabled and defined by the specification in accordance with 35 U.S.C. §112. since, in view of the above, the specification enables the full scope of the bearings arrangements sufficient that that a person skilled in the art would be able to figure out how to the bearing arrangement in the

invention.

In the case of '841, each string is anchored (fixedly secured) on the body at one place called the "tailpiece": in '841 there is a bridge-tailpiece device that provides two areas to secure the ball-end of the string (See Exhibit E); at either the:

1) Bottom or end of the "vertical" portion extending through the back of the body -- in this case the string goes through the body and comes out on the side of the body where the bridge, etc. are visible, ie. the "top" of the body; or

2) Top area (showing the bridge element) where it is fixedly attached directly (via the ball end into a recess) -- accordingly, the ball end and the string itself is always above the "top" surface of the body.

In the '841 Summary of the Invention (Column 5, Lines 53-65):

> *Yet another object of the invention is to provide a fulcrum tremolo having an alternate string anchoring points 247 that are spaced apart from one another. One anchoring point 246 is provided at the bottom of the spring block or spring blade so that the anchoring point 246 is remote from the second critical point. The alternate anchoring point 247 is located adjacent the second critical point so that the length of the string between the second critical point and the string anchor 160 is substantially shorter when the string is anchored at the alternate anchoring point 247. Specifically, the alternate anchoring point 247 is located a distance from the second critical point that is substantially equal to the length of the wrappings on the end of the strings 160.*

The asserted claims of '841 use claim terms that are fully disclosed in the specification and known to those skilled in the art, and, therefore, easily meet the 35 U.S.C. §112 requirement.

Accordingly, since Hipshot knew that the asserted claims meet the requirement of 35 U.S.C. §112 and that the basis for the claim of paragraph 6 and 7 of the Counterclaim that could not survive, "sham" litigation is further exemplified.

Finally, since the claimed subject matter, McCabe respectfully asserts that the Asserted Claims are not obvious and the counterclaims 5– 9 should be dismissed.

F.    **Counterclaim Paragraph 9/ Inequitable Conduct**

Hipshot contends in paragraph 9 that the '094 patent is unenforceable because of inequitable conduct before the Patent and Trademark Office by Plaintiff. Hipshot contends intentional failure to disclose Storey '201 and contends '201 is a material earlier patent that Hipshot contends had been relied upon by an earlier patent examiner to reject claims in another related patent application filed by Plaintiff.

McCabe denies in part the allegations of paragraph 9 of the Counterclaims, particularly Hipshot's characterization of 37 C.F.R. §1.56. (a) relating to the duty to disclose material information to the Patent Office because it is incomplete and inaccurate. The duty is to disclose information "material to patentability *as defined in this section.*" For example, the regulation does not require an applicant to submit information that is cumulative to information already of record or information that is not related to the patentability of pending claims. McCabe asserts that he and his attorneys satisfied their duty of candor in all applications including those cited by Hipshot.

McCabe admits he was aware during the prosecution of '094 that Storey '201 had been cited by an Examiner during the prosecution of the '066 patent.

McCabe denies that '201 is for a "slightly different species of tremolo than the '094 patent".

McCabe denies that '201 "discloses each and every element recited in claims 24 and 25 of '094".

McCabe asserts that Hipshot fails to meet the heightened pleading standards required for such claims of inequitable conduct. See *Magarl, L.L.C. v. Crane Co.,* 2004 WL 2750252, *12 (S. D. Ind. 2004) ("A majority of courts have concluded that claims and defenses of inequitable conduct before the U.S. Patent and Trademark Office based on fraud must be pled with particularity and are subject to the heightened pleading requirements of Rule 9(b).") The heightened pleading standard arises from the fact that inequitable conduct is something of a euphemism

24

1    for fraud on the PTO. *Burlington Industries, Inc.v. Dayco Corp.*, 849 F.2d 1418,

2    1422 (Fed. Cir. 1988) ("The charge was formerly known as 'fraud on the Patent

3    Office,' a more pejorative term, but the change of name does not make the thing

4    itself smell any sweeter.")

5         McCabe contends that during the prosecution of '066 and following a May

6    19, 1994 Telephonic Interview with a first Primary Examiner, Patrick Stanzione,

7    minor changes to claim language were made to be "more descriptive", and in a

8    subsequent Office Action Summary dated April 16, 1996 for the asserted subject

9    matter of this present controversy embodied in claims 136-146 were "allowed".

10   Following a clerical error on the part of the USPTO the application was left

11   "unintentional abandoned" and later revived. A new Primary Examiner, Cassandra

12   Spyrou, was assigned who rejected the "allowance" based on the changes to claim

13   language agreed upon with the first Primary Examiner and then cited Storey '201.

14   McCabe and his patent attorney of record, Stephen Eland, argued in a June 11, 1997

15   Telephonic Interview and subsequent amendments that '201 was not material prior

16   art since it was not a "fulcrum tremolo" in view of common understandings and as

17   defined in the Specification and that, consequently, the basis for rejecting

18   Stanzione's allowance were epystomological not material.

19        McCabe contends that the prosecution history of '066 is unusual in its

20   conflicting opinions and allowances of claims by two separate primary examiners

21   marked by epystomological confusion, not only limited to the species of vibratos

22   called the "fulcrum tremolo", and the appropriate allowance of claims for

23   improvements that include the increase of the radial size of bridge elements on

24   fulcrum tremolos, "enlarged bridge elements", in unasserted claims of 9-12 of '066

25   which provide for compensating for the above effects concerning harmonic tuning

26   and string height issues. (See Answer, Exhibits F: Figures 6A-J, Sheet 6 of 12 of

27   '066 and '094)

28

Col. 9, line 52 – Col 10, line 8:

*When the base plate is pivoted, the intonation modules and, as a result, the bridge elements pivot with it so that the location of the second critical point changes, increasing or decreasing the tension on the strings. Since the strings each have a different cross-sectional size, there is a variable tensioning effect on the strings. To maintain the fine tuned character of the strings relative to one another, each of the enlarged curved surfaces of the bridge elements are varied relative to one another so that each of the second critical points travels along the surface in differing distances and thereby selectively changing the harmonic tuning. By providing the proper ratio between each of the enlarged curved surfaces on each of the bridge elements, it is possible to compensate for uneven string stretch and maintain the relative harmonic tuning between the strings during the pivoting movement of the tremolo. Furthermore, by increasing the radius of the first section relative to the radius of the second section the upward pitch change can be further augmented. Lastly, by varying the radii continuously a smooth transition from the first section to the second section can be achieved.*

*Another important feature of the invention is the increased radial size of the bridge elements for maintaining the string height relative to the fingerboard when the tremolo is used.*

McCabe contends that similar observations of the inherent condition where by the simple adjustment of the tension of a string both pitch and harmonic tuning can be simultaneously achieved as the fulcrum tremolo pivots back into the initial position are shown in claim 16 of '094 – the task often accomplished by fine tuners on the device itself. It is a physical fact that such improvements would be otherwise impossible on non-fulcrum tremolos and highlights the uniqueness of the fulcrum tremolo relative to other devices.

McCabe contends that a search of the USPTO website shows that the first and last patent for which Cassandra Spyrou served as an Assistant Examiner was 4,896,182 issued January 23, 1990 and 5,571,980 issued November 5, 1996, respectively. McCabe asserts that when Examiner Spyrou began work as the Primary examiner she was not fully aware of the epystomological issues concerning the Fender Stratocaster's '146 fulcrum tremolo and/or that as a newly appointed Primary Examiner she was "chatty" in making the '201 reference and then obligated to defend the reference in her new stature against well regarded understandings.

Upon information and belief, the Assistant Examiner during a portion of the

26

1   prosecution of '066 was Kimberly Lockett and familiar with the merits of the '201

2   recitation – as of June 12, 2009 the USPTO Web Portal incorrectly stated that

3   Lockett was the Primary Examiner. (See Answer Exhibit G).  On June 26, 2009,

4   after the June 18, 2009 filing of the Answer, Examiner Lockett returned a telephone

5   inquiry made by McCabe regarding whether she had been an assistant examiner

6   under second Examiner Spyrou during the prosecution of '066 in view of the error

7   on the USPTO web portal. McCabe states that Examiner Lockett disclosed in phone

8   conversation that she was not "able" to provide that information.

9       Prosecuted concurrently within the same Art Unit of the USPTO as '066,

10  neither the Assistant Examiner, Kimberly Lockett, nor the Primary Examiner,

11  William Shoop, Jr. cite Storey '201 in the unasserted 1999 McCabe US Patent No.

12  No. 5,986,191 ("'191") for improvements for fulcrum tremolos having a bearing

13  arrangement.  McCabe attorney, Stephen Eland, even after discussions with Spyrou

14  for '066 does not cite '201 as material prior art in '191.

15  McCabe contends that Assistant Examiner Kimberly Lockett served as the

16  Primary Examiner of record for '094 until after a Telephonic Interview with Lockett

17  and the Supervisor, David Martin, in August 2004, the claims of '094 were allowed.

18  The telephonic interview conference call between McCabe then attorneys, Michael

19  Smith and Ellis Rameriz, McCabe, Examiner Kimberly Lockett and Supervisor

20  David Martin discussed matters regarding unasserted claims 1 – 23. McCabe

21  contends that, additionally, Examiner Lockett stated at that time that she and

22  McCabe had prior discussions regarding the claim language and that the asserted

23  claims 24 and 25 were allowable. McCabe contends that McCabe recalls that

24  Examiner Locket and he discussed Storey '201 during the prosecution of '094 and

25  that the Examiner had dismissed its material relevancy at least in view of her prior

26  experience as an assistant examiner familiar with the subject matter. McCabe

27  contends that consistent with other USPTO decisions, neither Examiner Lockett nor

28

1  Supervisor Martin nor McCabe attorney, Michael Smith, cite '201 as material prior
2  art.

3      Lockett, the Primary Examiner for '841, which includes claims for
4  improvements in "fulcrum tremolos" with a bearing arrangement, did not cite '201.
5  And in 2003, yet another McCabe US Patent No. 6,563,034 ("'034") for
6  improvements in "fulcrum tremolos" with a bearing arrangement was prosecuted
7  with a similar specification to '066, '094, '841 and '191, and the Primary Examiner,
8  Shih-Yung Hsieh, did not cite the '201 patent.

9      McCabe contends that for all of the above referenced patents for
10 improvements in fulcrum tremolos with a bearing arrangement (excluding '066
11 where there were two Examiners), spanning nearly two decades, four Examiners and
12 at least one Supervisor, all in the same "Art Unit" at the USPTO, as well as the
13 McCabe patent attorneys, '201 was never considered to be or cited as material prior
14 art. McCabe asserts that Examiner Spyrou's '201 prior art recitation was due to
15 confusion in contemporary language meaning at the time of prosecution for the
16 claimed subject matter and that '201 is not material to the consideration of the '094
17 or '066 claims.

18     Further, in view of the preponderance of the above facts and evidence and:

19     The U.S. Court of Appeals for the Federal Circuit's August 25, 2008
20     decision in Star Scientific, Inc., v. R.J. Reynolds Tobacco Company,
       ___ F.3d ___, 2008 U.S. App. LEXIS 18160 (Fed. Cir. 12008) (Docket
21     No. 2007-1448) identified the standard which must be met to prove
       inequitable conduct and also provided clear guidance regarding the
22     procedural burdens. An alleged infringer must carry its burden of
       proving intent to deceive the United States Patent & Trademark Office
23     (USPTO) by clear and convincing evidence before the patentee will be
       required to provide a good faith explanation of its conduct.
24

25     Accordingly, McCabe asserts that '201 is not a valid material reference in the
26 prosecution of '066, there was no intent to deceive since:

27     1. The recitation of '201 in the prosecution of '066 comprises "information
28        already of record" since '066 and '094 share the same parent application;

28

the '094 and '66 patents state respectively:

> *This is a continuation of pending application Ser. No. 08/027,729, filed Jan. 14, 1993, which is a divisional of application Ser. No. 07/607,458, filed Oct. 31, 1990, which issued on Mar. 30, 1993 as U.S. Pat. No. 5,198,601, which are each incorporated by reference as if fully set forth herein;*

And

> *This Application is a division of Application 607,458, filed Oct. 31, 1990 now U.S. Pat. No. 5,198,601.*

2. McCabe recalls that Examiner Locket and he briefly discussed Storey '201 during the early stages of the prosecution of '094 and that the Examiner had dismissed its material relevancy at least in view of her prior experience as an assistant examiner familiar with the instant subject matter;

3. As elaborated herein the Storey '201 patent does not disclose a vibrato "slightly different" from a fulcrum tremolo as commonly understood to the music instrument community in general, in view of the requirements clearly stated in the specifications of the Asserted Patents, expert testimony by co-inventor of '201, Gary Kahler, and at least claims 9-12 of '066 which would not otherwise work on other species of tremolos; and

4. As elaborated herein, it is impossible that '201 "discloses each and every element recited in claims 24 and 25 of '094" at least since '201 is not a fulcrum tremolo; and

5. As stated above, the USPTO, other than in the unusual instance of '066, spanning nearly two decades, four Examiners and at least one Supervisor, all in the same "Art Unit" at the USPTO, as well as the McCabe patent attorneys, '201 was never considered to be or cited as material prior art reference as shown in part by:

   a) Borisoff 6,015,945 ("'945") for bearing arrangements on a fulcrum tremolo, and;

29

1

2

b) McCabe '034 and '191 patents for improvements to a bearing arrangement on the fulcrum tremolo. (See Answer, Page 11);

3

4

5

6

7

8

The Court noted that it is the accused infringer's burden to prove both the "materiality" and "intent to deceive" prongs of the inequitable conduct defense by clear and convincing evidence. Accordingly, the Court reasoned, "the patentee need not offer any good faith explanation unless the accused infringer first carried his burden to prove a threshold level of intent to deceive by clear and convincing evidence." *Star Scientific,* 2008 U.S. App. LEXIS 18160 at *24-25.

9

10

11

12

13

McCabe contends that the above preponderance of evidence and facts not only shows that McCabe acted properly before the USPTO by dismissing the '201 reference with Examiner Locket during the prosecution of '094 since '201 is not generally held to be material prior art to '066 or '094 and was a document of record but shows Hipshot fails to meet the above bar required in their allegations.

14

15

16

17

18

Further, McCabe contends the Hipshot assertion is "sham" litigation since Hipshot and/or Hipshot attorneys knew or should have known that the allegations of Inequitable Conduct would not survive an examination since most of what is disclosed above was known or should have been known prior to the filing of the Counterclaim.

19

### G.    Objectively Reckless Conduct/Willful Infringement

20

21

22

23

24

25

26

27

*In re Seagate Tech, LLC,* 497 F. 3d. 1360 (Fed. Cir. 2007) cert denied 128 S. Ct. 1445 (2008), the Federal Circuit, sitting en banc, abandoned its previous standard for determining whether an act of patent infringement is sufficiently "willful" to warrant enhanced damages under 35 U.S.C. § 284. In the course of overruling *Underwater Devices, Inc. v. Morrison-Knudsen Co.,* 717 F.2d 1380 (Fed. Cir. 1983), which had imposed an affirmative duty of care on those with actual notice of another's patent rights, the Court adopted an entirely new, and more exacting test for willfulness, declaring:

28

1
2
3
4
5
6
7
8
9

*In contrast, the duty of care announced in <u>Underwater Devices</u> sets a lower threshold for willful infringement that is more akin to negligence. This standard fails to comport with the general understanding of willfulness in the civil context, <u>Richland Shoe Co.</u>, 486 U.S. at 133 ("The word 'willful' . . . is generally understood to refer to conduct that is not merely negligent."), and it allows for punitive damages in a manner inconsistent with Supreme Court precedent, <u>see, e.g.</u>, <u>Safeco, slip op. at 6-7,18-19, 21 n.20</u>; <u>Smith v Wade</u>, 461 U.S. 30, 39-49 (1983). Accordingly, we overrule the standard set out in <u>Underwater Devices</u> and hold that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness. Because we abandon the affirmative duty of due care, we also reemphasize that there is no affirmative obligation to obtain opinion of counsel. In re Seagate Tech, LLC, 497 F. 3d. 1371*

10

11    And further,

12
13
14
15
16
17
18
19

*Although new uncertainties are introduced by the court's evocation of "objective standards" for such inherently subjective criteria as "recklessness" and "reasonableness," I trust that judicial wisdom will come to show the way, in the common-law tradition. The standards of behavior by which a possible infringer evaluates adverse patents should be the standards of fair commerce, including reasonableness of the actions taken in the particular circumstances. It cannot be the court's intention to tolerate the intentional disregard or destruction of the value of the property of another, simply because that property is a patent; yet the standard of "recklessness" appears to ratify intentional disregard, and to reject objective standards requiring a reasonable respect for property rights.*

20    *Seagate's* use of "objective recklessness" as the threshold criterion for
21    enhancement:

22
23
24
25
26
27
28

*We fully recognize that "the term [reckless] is not self-defining." <u>Farmer v. Brennan</u>, 511 U.S. 825, 836 (1994). However, "[t]he civil law generally calls a person reckless who acts . . . in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." <u>Id.</u> (citing Prosser and Keeton § 34, pp. 213-14; <u>Restatement (Second) of Torts</u> § 500 (1965)). Accordingly, to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. <u>See Safeco</u>, slip op. at 19 ("It is [a] high risk of harm, objectively assessed, that is the essence of recklessness at common law."). The state of*

31

1  *mind of the accused infringer is not relevant to this objective inquiry. If this*
2  *threshold objective standard is satisfied, the patentee must also demonstrate*
3  *that this objectively-defined risk (determined by the record developed in the*
4  *infringement proceeding) was either known or so obvious that it should have*
   *been known to the accused infringer. We leave it to future cases to further*
5  *develop the application of this standard.*

6  McCabe contacted Hipshot in 1998 with information regarding McCabe's
7  1993 unasserted patent 5,198,601 ("'601") which shares the same parent application
8  with '066 and '094 and patent pending information regarding '066 and other
9  unasserted McCabe applications in 1998 in an effort to have Hipshot manufacture
10 his improved fulcrum tremolos and provided by US Mail, upon Hipshot's Borisoff's
11 approval, documents that included his designs for a fulcrum tremolo bearing
12 arrangement and an alternate string anchoring provision.  Subsequently, Borisoff
13 declined the offer and later that year applied for his own patent on a bearing
14 arrangement with claims that include "at least one ball bearing member" and/or a
15 "portion of a ball bearing surface" as defined in the Asserted Patents and by
16 common definitions and/or a "transverse shaft" which is referred to a  "cylindrical"
17 "bearing surface" positioned within a cutout housing, forming the fulcrum pivot
18 axis. '945, applied for in 1998 issues in 2000 issues prior to '066 with priority to
19 1990 in 2001.

20 McCabe alleges that Borisoff does not disclose knowledge of '601 and other
21 McCabe applications to the USPTO during the prosecution of '945 despite clear
22 priority since at least there is no reference of '601 in the issued '945 patent.
23 McCabe '601, sharing the same parent application of '066 and '094, shows Figs 3,
24 4A and 4B of '066 and '094.  McCabe asserts the omission of an extremely similar
25 arrangement comprises "inequitable conduct" before the USPTO during the
26 prosecution of '945 and established a first instance of the character of Hipshot's
27 Borisoff's and, thereby, establishes a basis for "objective reckless" behavior towards
28 patents.

32

1    *Trading Techns. Int'l, Inc. v. eSpeed, Inc.*, 2008 U.S. Dist. LEXIS 295 at * 4-

2    10 (N.D. Ill. Jan. 3, 2008). In this case a jury, instructed consistent with the *Seagate*

3    standards, found willful infringement. The district court set aside the willfulness

4    finding, concluding that the threshold requirement of objective recklessness had not

5    been proven and thus that the subjective evidence of bad faith on which plaintiff

6    relied was not dispositive.  Much of that evidence had focused on the defendant's

7    alleged copying of the patented technology while the plaintiff was prosecuting its

8    patent application. The court did acknowledge that pre-patent conduct, such as

9    "egregious copying," is still a relevant factor even under *Seagate*, but only *after* the

10   plaintiff proves the necessary objective recklessness, which can "only arise once a

11   patent issues." *Id.*, at * 8.

12   McCabe contends, the bearing structure of Borisoff '945 including the riser

13   posts, the ball tipped bearings, transverse shaft and cutout housings closely follow

14   the disclosed figures and text of '601 issued in 1993 five years prior to the

15   application date of '945.  Accordingly, in view of *Trading Techns. Int'l, Inc. v.

16   eSpeed, Inc.* McCabe asserts the "pre-patent conduct" of "egregious copying" is a

17   relevant factor now that not only have '066 and '094 have issued and are currently

18   licensed and in view of the above the bar of objective recklessness is met.

19   Further, in view of *Seagate's* *"We leave it to future cases to further develop

20   the application of this standard"* statement the law on the point of obtaining

21   competent legal opinion is still developing.  To date, in *Qualcomm, at 2007* U.S.

22   Dist. LEXIS 86627 * 13, at least one court has approved an instruction;

23

24   *In considering whether Qualcomm acted in goodfaith, you should consider all
     the circumstancesincluding whether or not Qualcomm obtained andfollowed
     the advice of a competent lawyer withregard to infringement. The absence of*

25   *a lawyer's opinion, by itself, is insufficient to support a finding a willfulness,
     and you may not assume that merely because a party did not obtain an*

26   *opinion of counsel, the opinion would have been unfavorable. However, you*

27   *may consider whether Qualcomm sought a legal opinion as one factor in
     assessing whether, under the totality of the circumstances,*

28

1    Without running afoul of *Knorr-Bremse systeme Fuer Nutsfahrzeuge GmbH*

2    *v. Dana Corp,* 344 F. 3d 1336, 1341 (Fed. Cir. 2003) (en banc) that would inform

3    the jury that:

4    - It is not *necessary* that an opinion be obtained but;
5    - The *absence* of an opinion is one factor among many that may be
6      considered in the determination of the subjective knowledge of the
       infringer.

7    This would seem consistent with *Seagate's* suggestion that the "standards of

8    commerce" are among those to be considered in subjective inquiry, *Seagate,* 497

9    F.3d at 1371, n. 5, for the standards of commerce in the presence of an objective risk

10   of infringement liability would typically include resort to competent legal advice.

11   Further, in a best case scenario Hipshot could weakly assert that the accused

12   fulcrum tremolo products represent a "design around" effort.  In *State Industries,*

13   *Inc. v A.O. Smith Corp.,* 751 F. 2d 1226, 1235-36 (Fed. Cir. 1985) the court

14   indicated that obtaining a competent legal opinion of non-infringement would be a

15   powerful argument for overcoming allegations of willfulness in such circumstances.

16   McCabe asserts upon information and belief that no such legal opinion was

17   obtained at least since the purported "design around" which led to the 1998 Borisoff

18   patent application did not include the disclosure to his attorneys, a disclosure of

19   which would have led to an opinion, which regardless of their learned position,

20   would have led to the appropriate disclosure to the USPTO.

21   As above McCabe asserts that '945, the first US patent for bearings on a

22   fulcrum tremolo after the seminal McCabe 1990 application, was issued in view of

23   Rose '661 and Saijo '302 as well as Saijo '374 and subsequent features such as a

24   transverse shaft and/or riser posts appear in dependant claims. And yet, '661, '302

25   and '374 are the same references that Hipshot has cited against McCabe in claim 1

26   of '066 and claim 24 of '094 and which, as McCabe asserts, comprise more

27   limitations than '945 claim 1 but '066 and '094 have an earlier priority date by eight

28

1  years.

2      Immediately after '066 issues in 2001, McCabe alleges that McCabe puts
3  Borisoff on notice in 2001 and Borisoff denies infringement (See Answer page 21)
4  despite both were issued under the critical '661, '302 and '374 references; and in the
5  case of '066 and '094, the additional rigor found in the reference for Shiboya '466
6  of which '070 is cumulative. Upon information and belief, Borisoff does not obtain
7  a bone fide legal opinion regarding the infringement controversy and thereby
8  establishes additional criteria for establishing the basis for objective reckless
9  conduct. Hipshot continues manufacturing, selling and expanding his "patented ball
10  bearing" fulcrum tremolo lines.

11      Again, after '094 issues in 2005, McCabe puts Borisoff on notice; and in
12  email and phone conversation, Borisoff denies infringement. Upon information and
13  belief, McCabe contends that Borisoff failed to once again obtain a legal opinion
14  regarding the infringement controversy and continued to manufacture, sell, etc. the
15  accused fulcrum tremolo products. McCabe contends that such lack of action
16  comprises additional criteria for establishing the basis for objective reckless
17  conduct.
18

19      Further, in a second instance mirroring the 1998 circumstances, McCabe
20  alleges that Hipshot was notified of pending claims, subsequent USPTO Office
21  Actions that provide for the allowance of the asserted claims and, finally, the notice
22  of allowance years prior for designs disclosed originally to the Defendant in 1998
23  regarding the asserted claims of '841 for a novel combination bridge-tailpiece
24  having an alternate string anchoring provision, a product wholly distinct to the
25  accused Hipshot fulcrum tremolo products.

26      McCabe alleges that Borisoff stated in phone conversation around 2005 that
27  Hipshot was aware of prior art that would tend to invalidate '841 claims and
28  continued to manufacture and sell the accused product; McCabe alleges further

1  requests for such references were denied.

2      As it turns out, the Hipshot reference (See Exhibit D), only first produced in
3  February 2009, comprises a tailpiece portion having an alternate string anchoring
4  provision not a combination bridge-tailpiece with the claimed limitations. McCabe
5  contends Borisoff's conduct in Hipshot's lack of cooperation in not providing to
6  McCabe the claimed prior art recitation in a timely manner in view of USPTO
7  requirements must establish another basis for objective recklessness in regards to
8  McCabe patents as well as for the process for obtaining and enforcing such rights.
9  And further, McCabe asserts the profoundly inadequate nature of the prior art
10 references itself, if not a blatant attempt in to avoid licensing based on asserting
11 non-material prior art, must indicate that there was no "competent" legal basis for
12 the denial of infringement of allowed claims and, later, McCabe's '841 patent.

13     In *Cohesive Techs., Inc. v. Waters Corp.,* 526 F. 2d 84 (D. Mass. 2007). After
14 a jury trial produced a finding of infringement against the defendant, the court
15 conducted a bench trial on willfulness in view of the recently decided *Seagate*
16 standard. The court denied enhancement, emphasizing that there was extensive
17 evidence showing the defendant evaluated the plaintiff's technology even when it
18 was pending the USPTO, held a meeting among it in-house counsel and scientists,
19 and determined the infringing product did not meet the limitations of the asserted
20 claims.
21

22     McCabe asserts that upon information and belief that contrary to the behavior
23 of the infringer in *Cohesive Techs., Inc. v. Waters Corp.,* Hipshot never performed
24 or had performed an evaluation of McCabe technology and/or obtained competent
25 legal opinions in 1998 in regards to, at least, the '601, or later in 2001 for '066 and
26 in 2005 for '094 leading up to and including 2009 for the '841 patent in order to
27 provide a basis to conclude there was no *"objectively-defined risk"* before or while
28 proceeding with the manufacture of any of the accused products including the

cosmetically altered ball tipped pins on the fulcrum tremolo products that Hipshot currently offers for sale since 2008. The lack of such prudent action on the part of Hipshot is substantial additional criteria for establishing the basis for objective reckless conduct.

On several occasions in conversation McCabe asserts that Borisoff indicated that since Hipshot sells only "small amounts" of the accused products, there is no need to license.

Judge Gajarsa observed the statute is capable of being interpreted as vesting the district court with discretion to make enhancements for a variety of non-punitive purposes, such as to assure that the award properly compensates for the injury caused in the circumstances of the case .... *Seagate,* at 1377-78 (concurring opinion of Gajarsa).

McCabe asserts, therefore, that by clear and convincing evidence that Hipshot acted (1) despite an objectively high likelihood that Hipshot's actions constituted infringement of a valid patent and that (2) Hipshot knew or should have known of that objective risk.

Again, McCabe contends the Hipshot Counterclaim is "sham" litigation since Hipshot and/or Hipshot attorneys knew or should have known that the allegations of Inequitable Conduct involving '201 would not survive an examination since most of what is disclosed above was known or should have been known prior to the filing of the Counterclaim.

Further still, McCabe contends that Hipshot assertion of the '201 patent in the Counterclaim is entirely consistent with the above conduct intended to avoid licensing valid patent(s) and, hence, willful, since Hipshot's Borisoff did not disclose '201 as material in '945 because Borisoff understood, like the rest of the musical instrument and hardware manufacturing community that '201 is not a fulcrum tremolo. Accordingly, McCabe further asserts that such action further

1  comprises a basis for establishing objective reckless conduct.

2      McCabe contends Hipshot has not met the *"standards of behavior by which a*

3  *possible infringer evaluates adverse patents"* nor  *"the standards of fair*

4  *commerce"; In re Seagate Tech, LLC.*

5      But far more importantly, McCabe contends that the apparent simplicity and

6  inherently small monetary scale of the Hipshot continual denial of infringement,

7  asserting non-material prior art, etc. in order to avoid the licensing that Hipshot,

8  otherwise, feels is inappropriate either because Hipshot has deemed the sales

9  number to be insufficient to honor the patent and the inventor's rights of McCabe or

10  simply holds an uninformed contradictory position on merits of a patent in view of,

11  or lack thereof, prior art references or omitting critical patents and patent

12  applications in Borisoff's own prosecution for a patent on the same subject matter

13  has established a gateway for infringement of the McCabe portfolio resulting in a

14  disproportional damage to both McCabe and the McCabe technology within the

15  musical instrument and hardware manufacturing community.

16      McCabe also contends that holding such a position, knowingly or

17  unknowingly, whereby patents for bearing arrangements and other improvements

18  could be infringed without impunity established a pattern of a denial of rights that

19  have undermined McCabe licensing efforts resulting in lengthy legal battles such as

20  at the ITC level beginning in 2006, great losses of time and money in order to

21  rectify as well as losses to livelihood and position in the market place.

22      On January 12, 2009 brought suit against Hipshot for willful patent

23  infringement seeking enhanced monetary damages and other relief.

24

25              **III.  SUMMARY**

26      In addition to those denials and assertions in the Counterclaim, McCabe

27  reasserts and/or newly contends that:

28      • Hipshot fails to state a claim in paragraphs 5-9 upon which relief can be

38

granted.

- The USPTO acted correctly in issuing the Asserted Patents and are valid.

- The Asserted Patents continue to meet the requirements for "the conditions for patentability as set out in 35 U.S.C. §102, §103, and/or §112.

- Hipshot knew or should have known that the basis of their allegations could not survive judicial evaluation prior to filing the Counterclaim.

- Hipshot is pursuing "sham" litigation in the Counterclaim.

- Hipshot has conceded that the Asserted Patents relate to fulcrum tremolos in the Counterclaim.

- Fender '146 is for a "fulcrum tremolo", as recognized at least in the professional music world, the ITC Expert Report of Gary Kahler, and as defined in the specifications for the Asserted Patents.

- The '201 patent is not a "fulcrum tremolo", as recognized at least in the professional music world, the ITC expert report of Gary Kahler, and as defined in the specifications for the Asserted Patents.

- The '201 patent is not for a "slightly different species of tremolo than the '094 patent".

- The '201 patent does not "disclose[s] each and every element recited in claims 24 and 25 of '094" since at least '201 is not a fulcrum tremolo.

- The '201 patent is not material to '066 or '094 as alleged in the Counterclaim.

- The '201 patent is not material to the Counterclaim.

- Contrary to the allegations in the Counterclaim, McCabe and his attorneys met their duty to disclose '201 in the prosecution of '094 and other unasserted patents.

- Hipshot fails to meet the heightened pleading standards required for

39

such claims of inequitable conduct.

- '945 is material to USPTO standards and concerns of "objectively reckless" conduct in, at least, its prosecution.

- Hipshot and/or Hipshot's Borisoff behavior meets the bar of "objectively reckless" conduct.

## IV. CONCLUSION

To establish a likelihood of success on the merits, plaintiff must "demonstrate a reasonable likelihood that at the trial on the merits its can prove by a preponderance of the evidence that Hipshot's products infringe" at least one of the claims in the plaintiff's patents. *Lubrizol Corporation v. Exxon Corporation*, 7 USPQ2d 1513, 1525 (N.D. Ohio 1988). McCabe contends such a bar is met in view of the evidence herein and in the Answer and that the Amended Complaint is likely to succeed on all counts of willful infringement by Hipshot.

McCabe re-alleges that Borisoff and Hipshot and/or their lawyers are either:

a)    Guilty of inequitable conduct before the USPTO for not citing '201 and '601 themselves in the prosecution of '945;

OR

b)    Guilty of inequitable conduct in filing the Counterclaims since at least Hipshot and their attorneys knew and have long accepted that the '201 patent is not material to the prosecution of "fulcrum tremolos" with bearing arrangements in general since at least 2000 when '945 issued (or Hipshot would have cited '201 themselves since they cannot claim ignorance of the world famous Kahler Tremolo) and has, therefore, by the action against McCabe, in a clearly premeditative manner, willfully and knowingly committed fraud by falsely asserting '201.

Since the first allegation is the weakest in view of the foregoing, McCabe

40

1  asserts that Hipshot and its attorneys have exposed themselves to a greater liability

2  than just the long-running willful infringement.

3       McCabe reasserts the Hipshot Counterclaims is another example of Hipshot's

4  and their attorney's recent abusive tactics (See Answer, Exhibit E) and perpetual

5  professional and moral misconduct in "gaming the system" in their hypocrisy and

6  arrogance of other's rights in resisting accountability for their original copying of

7  McCabe's patent pending work shown to Hipshot in 1998, Hipshot's subsequent

8  filing with the USPTO for '945 only months thereafter and the omission of '601,

9  McCabe putting Hipshot's David Borisoff, upon information and belief, in the

10 presence of either associate Hipshot attorney, Saul Epstein, or David Borisoff's

11 father, on notice in late January 2001 after '066 issued on Jan 16, 2001 and

12 materially profiting and expanding their business thereafter from McCabe

13 discoveries and inventions.

14       McCabe restates that the Plaintiff remains at least dismayed by Hipshot's

15 continual denial of infringement, unwillingness to provide credible sales data,

16 rejection of reasonable offers to settle and license, reckless behavior, abuse of power

17 and the wasting of the Court's valuable time and resources in yet another frivolous

18 attempts to skirt responsibility.

19

20

21                    **PRAYER FOR RELIEF**

22 WHEREFORE counterclaimant McCabe prays for judgment that:

23     a)    Hipshot willfully and fraudulently asserted '201 in the Counterclaim;

24     b)    Hipshot receive sanctions as the Court may deem just and proper for

25           the willful "sham" litigation including but not limited to the assertion

26           of '201 in the Counterclaim;

27     c)    McCabe awarded any and all additional monetary, other and further

28           relief as the Court may deem just and proper under the current

41

1    circumstances;

2    d)    Clarity be given on issues surround Objectively Reckless Conduct on

3          behalf of Hipshot and/or David Borisoff of Hipshot;

4    e)    Clarity be given on issues surrounding the materiality of '945 and

5    f)    The Counterclaim be dismissed immediately.

6    I declare under penalty of law that the foregoing is true and correct.

7    Dated:  August 21, 2009

8    6104 Glen Oak
     Hollywood, CA 90068                    Pro Se
9                                            Geoffrey McCabe

10                                           By:
11                                           Plaintiff/Counterdefendant Geoffrey McCabe

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

FIG. 3



**EXHIBIT B**



*FIG. 4B*



*FIG. 4A*



*FIG. 4C*

**EXHIBIT C**